## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PATRICIA J. CLARKE and DEBORAH R. WOLFARD, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-0232-CVE-SAJ |
| | ) | |
| BANK OF COMMERCE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment (Dkt. # 16), Defendant Bank of Commerce's Motion in Limine (Dkt. # 23), the Motion of Defendants [sic] to Strike Plaintiffs' Untimely Pretrial Disclosure, Plaintiffs' Errata Correction to Response to Defendants' Motion for Summary Judgment and to Strike Statements from Plaintiffs' Response (Dkt. # 27), and the Defendant's Unopposed Application to Withdraw Defendant's Motion to Strike Pretrial Disclosures (Dkt. # 28). Plaintiffs Patricia J. Clarke ("Clarke") and Deborah R. Wolfard ("Wolfard") filed a complaint (Dkt. # 2) on April 25, 2006 alleging that defendant Bank of Commerce ("Bank of Commerce" or the "Bank") allowed the commission of sexually offensive acts that constituted a hostile work environment, in violation of Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e et seq. They also allege that defendant treated plaintiffs differently than similarly situated male employees based on their sex, also in violation of Title VII. Plaintiffs claim that Wolfard was terminated based on her sex and that Clarke was constructively discharged because the work conditions were so intolerable. Defendant argues that the facts fail to establish a hostile work environment claim. It contends that there is no genuine issue of material fact as to Clarke's

alleged constructive discharge and that Wolfard was legally terminated based on her failure to meet her production goals. For the reasons set forth below, the Court finds that defendant's motion for summary judgment should be granted. Defendant's other motions (Dkt. ## 23, 27, 28) are moot.

## I.

Jan Miller ("Miller"), president of Bank of Commerce, hired Clarke as the branch manager of Bank of Commerce's Tulsa branch. She was responsible for producing commercial loans, and her productivity goals were based on commercial loan volume. Dkt. # 17-5, Deposition of Miller, at 8. When Clarke first started working at Bank of Commerce, Miller was Clarke's supervisor. Dkt. # 17-3, Deposition of Clarke, at 6.

While Wolfard was working at Grand Bank, Clarke contacted Wolfard and encouraged her to interview with Bank of Commerce. Dkt. # 17-8, Deposition of Wolfard, at 5. Wolfard interviewed with Clarke and Miller and was hired by the Bank on August 1, 2002 as the senior vice president of mortgage lending. Id. at 3. This was a new position created for Wolfard. Id. at 5. Though the Bank had "dabbled" in the mortgage business prior to Wolfard's arrival, her responsibility was to set up a formal secondary mortgage lending business. Id. One of Wolfard's essential job functions was to "meet[] or exceed[] established production goals by originating mortgage loan applications and developing lending relationships with realtors, builders, developers and other sources of loan referrals." Id. at 6.

At the time both Clarke and Wolfard were hired, the Bank had a sexual harassment policy in place. The 2002 personnel policy manual read:

> *Harassment on the basis of sex has no place in the Bank and will not be tolerated* from any employee or officer regardless of position with Bank. This includes, but is not limited to, unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. Furthermore, no supervisor/manager

2

or employee will threaten or insinuate either explicitly or implicitly that a staff member's refusal to submit to sexual advances will adversely affect the staff member's employment, evaluation, wages, advancement, assigned duties, shifts, or any other condition of employment or career development.  The Bank will also not permit discriminatory practices involving customers, suppliers, or others working at the Bank.

Dkt. # 17-2, at 3 (emphasis in original).  It further set forth the following complaint procedure:

*Any employee or supervisor/manager who violates this policy may be subject to severe disciplinary action up to and including termination of employment*.

Any employee who feels that he/she is a victim of sexual or any other form of harassment by any supervisor/manager, employee, family member of an employee, customer, outside contractor, or agent should *immediately* bring the matter, preferably, first to the attention of their supervisor/manager; if the employee is uncomfortable discussing the matter with their [sic] supervisor/manager, then it should be brought to the attention of the President/CEO.

All complaints will be promptly investigated, and information will be treated as confidentially as necessary for the investigation.

Employees reporting incidents of harassment will be protected from reprisals, but may be subject to disciplinary action if their allegation is found to have been made falsely and vindictively motivated.

Id. (emphasis in original).  The manual provided a more detailed description of the procedure for reporting harassment, including an appeal process.  Id. at 4.  The 2005 sexual harassment policy, which was in place when Clarke resigned and Wolfard was terminated, was virtually identical to the 2002 policy.  Dkt. # 17-3.

Both Clarke and Wolfard were aware of the Bank's sexual harassment policies and procedures.  Clarke testified that, as bank manager, she was responsible for ensuring that all employees in the Tulsa branch had read the policy.  Dkt. # 17-4, at 10.  She was also responsible for implementing the policy.  Id.  Wolfard testified that she recalled reading the 2002 policy when she

3

was hired.  Dkt. # 17-8, at 17.  She signed a certification document acknowledging that she read and understood the contents of the manual.  Id. at 18.

In April 2003, the Bank hired Scott Buckmaster ("Buckmaster") as an executive vice president and the chief lending officer of the Bank.  Dkt. # 17-5, at 9.  He was Clarke and Wolfard's supervisor with respect to any lending issues.  Id.  However, Buckmaster had no branch management authority; such authority remained with Clarke.  Dkt. # 17-4, at 9.

For his officer computer "wallpaper", Buckmaster uploaded a picture of his wife and several female friends, including his assistant Kelly Rossman ("Rossman"), clad in bikinis and sitting on his boat.  Dkt. # 17-6.  Both Clarke and Wolfard expressed concern about this photograph.  Clarke testified as follows:

> Q:     Tell me what message that sent to you when you saw that picture on his computer.
> A:     That he was unprofessional because, again, I don't think that has any place in a professional environment.
> Q:     What else, if anything?
> A:     To some degree fear because this is my new boss and he's come in with the attitude that he can introduce unprofessional – I mean these women were in bikinis laying on his boat in my branch in the work environment.  You know, who does he think he is?

Dkt. # 17-4, at 12.  She thought that it was "disgusting" that Buckmaster had a picture of Rossman in a bikini.  She explained, "I think that sends a message to the other women in the branch that he enjoyed looking at women in bikinis so much that he couldn't contain it to the privacy of his own home."  Id. at 11.  In describing her reaction to the picture, Wolfard testified that she did not find the picture itself offensive; however, she was offended because she found the picture to be unprofessional.  Dkt. # 17-8, at 26.

4

According to Clarke, some other women at the Bank also disapproved of the photograph. Two other female employees reported their discomfort with the photograph.  After their complaints, Clarke met with Miller and Russ Potter ("Potter"), a manager at Bank of Commerce, prior to a loan committee meeting and informed them that some female employees at the Bank, including herself, found the photograph offensive. Dkt. # 17-4, at 11.  She believed that, in response to this conversation, either Miller or Potter would take action such as telling Buckmaster to remove the photograph from his computer.  However, "nothing happened" after she reported the problem. Dkt. # 21, Ex. D, at 9.  Wolfard also informally reported the issue of Buckmaster's computer wallpaper to Miller.  In passing, Wolfard told Miller that she found that photograph to be unacceptable.  Dkt. # 17-8, at 20.  "[Miller] simply rolled his eyes at that point in time in agreement and nothing else ever happened, I didn't go further, but I did mention it."  Id.

According to Clarke, Buckmaster had an inappropriate work relationship with Rossman.  She "never personally observed anything that would indicate they were having an affair." Dkt. # 17-4, at 11.  However, she found their relationship inappropriate based on "hearing about them partying at the lake every week-end together, the fact that he financed breast implants so she could have them done against her husband's wishes." Id. at 13.  She explained, "What they do or did on their own time, away from my staff was their business, but I didn't want it brought into the branch; I didn't want it brought into the bank.  It's up to them to decide what their morals are." Id.  Wolfard also testified that Buckmaster said at a board meeting, "you never have to worry about where your collateral is on Kelly Rossman's breast job because I own her boobs."  Dkt. # 20, Ex. A, at 29.

Clarke and Wolfard testified that they believed that Buckmaster treated them differently than their male colleagues. Clarke explained, "If I started to have a conversation with him, he would

5

interrupt me, not let me finish, but he would sit and listen to the other officers intently like they had

something to say.  Just his overall actions of treating me more like I was a secretary to him than an

officer of the bank that was competent of making decisions."  Dkt. # 17-4, at 8.  She found that

Buckmaster was "dismissive, disrespectful" with respect to her and "did not respect [her] decision-

making ability."  Id. at 9.  Clarke felt that he had a problem with women who were officers of the

Bank.  Id.  Wolfard testified that "Scott went around me for everything he wanted instead of treating

me as an equal and a department head.  I do not believe that that is appropriate at all.  I mean, you

follow the chain of command, that's my view."  Dkt. # 17-8, at 29.  Wolfard testified that "whenever

you need [Buckmaster] for anything he had an appointment with Troy [Anderson] or he had an

appiontment with Robbie [Nees] or he had an appointment in Adair with Randy."  Dkt. # 20, Ex.

A, at 6.  She claimed that he would not give her "the time of day" and "never had time to meet with

me."  Id. at 7.  According to Wolfard, Buckmaster treated her differently than her male counterparts.

However, she admitted that she did not know how Buckmaster treated her male colleagues.  Dkt.

# 17-8, at 29.

Clarke does not claim that Buckmaster ever made any sexual advances toward her:

Q:    Did Scott Buckmaster ever make advances to you, sexual advances?
A:    No.
Q:    Did he ever pressure you for any sexual favor or sexual conduct on the job?
A:    No.
Q:    Did he ever make overtures to you in which he somehow linked whether you
      might have sexual relations with you to how your job would be at the bank?
A:    No.
. . . .
Q:    Did he ever ask for a picture of you in a bikini to put on his computer?
A:    No.

Dkt. # 17-4, at 12.  Likewise, Wolfard does not claim that Buckmaster made any sexual advances

toward her.

6

Other than mentioning that Buckmaster's computer wallpaper was unprofessional, Clarke did not report to Miller that she believed that she was being sexually harassed. Clarke explained that she did not discuss the matter with Miller "based on historically things I had taken to Jan [Miller] before about Scott and nothing was done.  It was just a pattern of ongoing, you know, you take things – I took things to Jan and nothing was done, and I took other things to Jan and nothing was done."  Dkt. # 17-4, at 7.

Clarke also contends that Miller sexually harassed her by referring to her husband as "the man [she] happened to be sleeping with" rather that referring to him by his name or as her husband. Dkt. # 17-4, at 4.  She recalls Miller making such comments two times and in front of the entire loan committee.  Id.  She took offense to this comment and corrected Miller that her husband's name was Ed.  Id.  Clarke also contends that Miller permitted sexually harassing incidents to occur in his presence.  Dkt. # 17-4, at 4.  She testified that "Jan Miller was present in a lot of instances where Scott's behavior was ridiculous; it had no place in the work environment."  Dkt. # 17-4, at 8.

Wolfard testified that, at one board meeting, Buckmaster passed around pictures from a Sturgis motorcyle rally of topless women with paint over their breasts and of other scantily clad women. Dkt. # 20, Ex. A. At 33.  According to Wolfard, the men were "ogling" the women in these pictures.  Id. at 34.  She contends that these pictures "didn't offend me, no, I'm not a prude by any stretch of the imagination, but it was a business environment."  Id. at 35.  Wolfard believed that Sonda Roberts, another woman who was present when these picture were passed around, was offended based on her facial expression.  Id.

At the Bank's Christmas party in 2004, a hypnotist performed for entertainment.  Clarke described the hypnotist's performance as follows:

> There was a point during the show where the hypnotist was making a comparison between two men and the size of their penises. He told one man under hypnosis that he had a very small penis; he told the other man that he had like an enormous penis, and the he told the woman that if she leaned over and got real far down in her chair and looked and had her doing all of this, that she could actually see that he was wearing shorts, supposedly under hypnosis, and she could actually see up the leg of his shorts and he would see this enormous penis, and this went on and on.

Dkt. # 17-4, at 17. She described the performance as "X-rated." Id. Both Clarke and Wolfard found the hypnotist's performance to be offensive due to the sexual references and connotations. Clarke told Miller at the Christmas party that "this is not entertainment for a company Christmas party." Dkt. # 17-4, at 16. Miller "just basically nodded his head." Id. However, Miller claims that no one complained to him about the hypnotist. Dkt. # 17-5, at 2. Neither Clarke nor Wolfard left the Christmas party early. Dkt. # 17-4, at 16.[1]

After the Christmas party, Stacie Buckmaster, Buckmaster's wife, and Rossman approached Clarke. They invited her to come up to a hotel room for a "post-party." Clarke declined the offer, but Stacie Buckmaster and Rossman "started caressing me and told me they just wanted me to come up to the suite to party with them and that [Clarke's husband] could go home." Dkt. # 17-4, at 17. Clarke felt that they were recruiting her into a sexual encounter. Id. While Clarke did not accompany Stacie Buckmaster or Rossman, Wolfard and her husband joined them and Buckmaster in the hotel room. Craig Blacklock ("Blacklock"), a security guard at the Bank, and his girlfriend were also present. At some point, a conversation arose about tattoos. Rossman informed the party that she had a tattoo on a private area. Wolfard and Blacklock's girlfriend followed Rossman into

---

[1]     Defendant submitted a DVD of the hypnotist's performance. Plaintiffs objected to the submission of the DVD on the ground that the evidence was not produced during discovery. With respect to the hypnotist incident, the Court considered only the written evidence in the summary judgment record; therefore, plaintiffs' concerns regarding the DVD are moot.

the bathroom area so that she could show them her tattoo.  The tattoo was on her vagina, and Wolfard was highly offended that Rossman showed it to her.  Dkt. # 17-8, at 24.  Eventually, Wolfard and her husband left the party.  She claims that "the workplace definitely changed afterwards, Kelly [Rossman] would not even look me in the eye, other than to briefly apologize for doing what she did."  Id. at 25.  Wolfard did not report this incident to Miller or another superior. Id.

Earlier, in February 2004, Clarke and Wolfard had been told "that our attendance to the board meetings was no longer necessary or required."  Dkt. # 17-4, at 15; Dkt. # 17-8, at 9. According to Clarke, "what we were told was that unless we had issues, problem credits, which could be delinquent loans, overdraft problems, production problems, budget issues, anything like that, if we started to have those issues, then we would be asked to come back and attend the meeting."  Id.  Wolfard testified as follows:

> Q:    Do you recall whether you would have been adverse to not attending the
>         board meetings anymore?
> A:    I can't say that I would have been adverse to it, I would have liked to have
>         always known that it was an opening for me if I needed to be there.

Id.  She did not feel that she was denied access to the board based on her non-attendance of the board meetings.  Id. at 10.  However, according to Wolfard, "there were male colleagues that did attend the board.  I can't tell you if any of the male colleagues were told not to attend the board." Id.  On June 1, 2005, the Bank issued a memorandum stating, "In February 2004 the directors expressed concerns that too many non-director bank officers were attending the board meeting.  The decision was made to limit the board meeting to Scott Buckmaster, Randy Ross and Russ Potter (All Executive Vice-Presidents)."  Dkt. # 21, Ex. G.  The memorandum further stated that Clarke, Wolfard, Robbie Nees, Tom Farus, and Troy Anderson were "no longer required to attend."  Id.

9

This memorandum was issued after Clarke had resigned and after Wolfard was terminated in spring 2005.

Eight or nine months after Wolfard was hired by the Bank, the Bank hired a consultant to review the mortgage lending business. Dkt. # 17-8, at 12. The consultant interviewed Wolfard and obtained reports on the mortgage loan production. In the spring or fall of 2004, Potter informally notified Wolfard that she needed to generate more income for the secondary mortgage department. Id. at 13. She recalls Potter telling her that the "numbers were low." Id. at 14. Potter created a chart entitled "Secondary Mortgage Income 2003-2004 Versus Budget" for the purpose of charting the income generated by Wolfard's department. Id. As compared to 2003, the income generated in the secondary mortgage lending department declined in January, February, March, April, May, June, July, and September 2004. Id. at 14-15. In 2003, the total income generated from Wolfard's department was $146,133; in 2004, the total income generated was $133,518. Id. at 15. Wolfard's salary was approximately $90,000 per year. Miller testified that he had several discussions in loan meetings about Wolfard's production reports and the low numbers. Dkt. # 17-5, at 14.

In 2004, Clarke did not meet her total loan production goals. Dkt. # 17-5, at 7. According to Miller, Clarke did not receive the budget until December 2004, "but she saw the budget in preparation of it earlier." Id.

Although they received raises in 2003 and 2004, see Dkt. # 17-4, at 14, Dkt. # 20, Ex. A, at 9, neither Clarke nor Wolfard received a raise in 2005. Eight other employees received raises in 2005, including six women and Buckmaster. Dkt. # 17-5, at 6. According to Miller, Clarke did not receive a raise in 2005 because she did not meet her production goals in 2004. Id. Miller testified that no one made a recommendation regarding Clarke's entitlement, or lack thereof, to a raise; he

alone made the decision not to give Clarke a raise.  Id.  Of the other eight individuals who received raises in 2005, only two persons – Jim Depriest and Buckmaster – had specific loan production goals.  Id. at 8-9.  Both Buckmaster and Depriest had met their production goals.

In 2004, while she was still employed at the Bank of Commerce, Clarke interviewed with Peoples Bank.  Dkt. # 17-4, at 2.  She accepted an offer of employment with Peoples Bank and resigned from Bank of Commerce on May 11, 2005.  She claims that she resigned, in part, because she "had had it with [Buckmaster]; I had had it with his actions; I had had it with everything he stood for; I had had all of him and his harassment and his intimidation, and I wasn't going to subject myself to it anymore."  Dkt. # 17-4, at 8.  She claims that she remained with the Bank for a long as she did "because I really thought in my mind that [Buckmaster] would be gone, that at some point in time upper management, the executive committee would say enough is enough and he would be gone."  Id.  However, prior to her resignation, she did not have a conversation with Miller regarding her perceived inability to thrive at the Bank so long as Buckmaster was her supervisor.  Dkt. # 17-4, at 7.  Miller testified that he was "extremely surprised" that Clarke resigned.  Dkt. # 17-5, at 11.  He stated that, although she had not met her 2004 production goals, "we didn't want her to leave.  We had not given up on her at all.  We thought she had ability to be a good leader and a good member."  Id.

The board of directors met in 2004 and discussed the possibility of terminating Wolfard based on her low production.  Id. at 18.  However, Miller decided not to terminate her at that time "because I though that perhaps she also would get out and do a better job if she understood she wasn't making her goals."  Id.  But when Wolfard's production continued to decline, Miller agreed that she should be terminated.  Id. at 19.  Wolfard was terminated on March 18, 2005.  Dkt. # 17-8,

at 4.  According to Miller, she was fired because "she was the second highest paid person in the bank and her department was costing a large amount of money just personnel wise and she wasn't making any money for the bank." Dkt. # 17-5, at 17.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## III.

Title VII makes it unlawful for an "employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Pursuant to Title VII, plaintiffs bring a hostile work environment[2] claim and a disparate treatment claim against defendant. The Court addresses their hostile work environment claim in Section A, and their disparate treatment claim in Section B.

## A.

Although Title VII does not specifically use the term "hostile work environment", it is well established that a victim of a sexually hostile work environment may bring a claim under Title VII. For sexual harassment to be actionable under Title VII, "it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citation omitted); Gross v. Burggraf Construction Co., 53 F.3d 1531, 1537 (10th Cir. 1995). To survive summary judgment, plaintiffs "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998). "The mere utterance of a statement which engendered offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." Gross, 53 F.3d at 1537 (quoting Meritor, 477 U.S. at 67) (internal quotations omitted). In

---

[2]    Plaintiffs' sexual harassment claim is not based on the quid pro quo theory.

determining whether the alleged sexual harassment rises to this actionable level, the Court must examine the totality of circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance such as the nature of the sexual advances and the context in which the alleged incidents occurred." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).

> There is both an objective and subjective component to a hostile work environment claim:
>
> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Harris, 510 U.S. at 21.  While plaintiffs must show that the environment was both objectively and subjectively hostile, they need not demonstrate psychological harm.  Id. at 20.  Further, plaintiffs are not required to show that their work suffered as a result of the harassment or that they wanted to quit their employment.  See Davis, 142 F.3d at134; Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1261 (10th Cir. 1998).

Here, based on plaintiffs' recitation of the facts, the following incidents contributed to a hostile work environment:

• Buckmaster displaying a photograph of women clad in bikinis on his computer;

• Miller's reference to Clarke's husband as the man she happened to be sleeping with;

• Buckmaster's statements regarding "collateral" on Rossman's breast augmentation;

• Buckmaster's passing around pictures of topless or scantily clad women at a board meeting;

• The sexually suggestive hypnotist's performance at the Bank Christmas party;

• Rossman's showing Wolfard her tattoo after the Christmas party.[3]

The Court will address the final two incidents first.

With respect to the "tattoo incident" following the Christmas party, the Court finds that this alleged same-sex sexual harassment is not evidence of discrimination <u>because of sex</u>.  Same-sex harassment is actionable under Title VII if the plaintiff can "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).  To determine whether discrimination occurred because of sex, Wolfard must present evidence from which the fact-finder could infer that she was harassed because she is a woman.  <u>Penry</u>, 155 F.3d at 1261.  "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." <u>Harris</u>, 510 U.S. at 25 (Ginsbug, J., concurring).  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." <u>Stahl v. Sun Microsystems, Inc.</u>, 19 F.3d 533, 538 (10th Cir. 1994); <u>Gross</u>, 53 F.3d at 1537.  Here, there is no evidence that Rossman showed her tattoo to Wolfard because she was a woman.  On the contrary, Rossman offered to show her tattoo to anyone who was present – men and women.  <u>See</u> Dkt. # 17-11, at 8.  Indeed, Wolfard testified that her husband also saw the

---

[3]     Plaintiffs also argue, in their response, that Buckmaster wore a t-shirt to work which read "Gritty Titties."  The Court finds no evidence of this fact in the summary judgment record.  The only references to "Gritty Titties" in the summary judgment record is testimony from Sandra Carter and Blacklock that they never saw Buckmaster wear such a t-shirt.  Dkt. # 17-9, at 6; Dkt. # 17-11, at 6.  Plaintiffs' reference to the t-shirt in their response does not constitute evidence.  Therefore, the Court does not include this "incident" in its analysis of the hostile work environment.

tattoo.  Dkt. #17-8, at 23.  Thus, this incident – although certainly vulgar  – is not evidence of discrimination because of sex.

In addition to the fact that the tattoo incident did not occur because of Wolfard's gender, the incident is minimally relevant to Wolfard's hostile work environment claim because it did not occur on business premises or during a business event.  This incident occurred <u>after</u> the Bank's Christmas party.  It was, in effect, a private "after-party" for persons who opted to join.  Wolfard may not have anticipated that Rossman would display her genitals; however, she voluntarily followed Rossman to the bathroom area to view the tattoo.  Because this incident occurred in a private setting, it is less probative of a hostile work environment.  <u>See</u> <u>Sprague v. Thorn Americas, Inc.</u>, 129 F.3d 1355, 1366 (10th Cir. 1997) (where there were five alleged incidents contributing to the hostile work environment, the fact that the most serious incident occurred "at a private club, not in the workplace" contributed to the Tenth Circuit's conclusion that the incidents were not sufficiently severe or pervasive to alter the conditions of the plaintiff's employment).

The Court also finds the hypnotist's performance at the Bank Christmas party was not a specifically gender-based incident.  The hypnotist based part of his performance on overtly sexual content, which included references to the size of the male volunteers' penises.  Clarke and Wolfard found this to be offensive and improper for a business Christmas party.  However, there is no evidence that  plaintiffs were the object of this alleged harassment because they were women.  On the contrary, both men and women were present at the performance.  A man could have viewed the performance as offensive an inappropriate as well, particularly since the performance focused on male genitalia.

Although the hypnotist's performance was not specifically gender-based, the Court will not disregard such evidence in evaluating whether the incidents presented by plaintiffs rose to a hostile work environment.  On the contrary, the Court must "eschew . . . a mechanical approach to analyzing hostile work environment claims." Penry, 155 F.3d at 1262.  As noted above, the Court must examine the totality of circumstances, including "the context in which the alleged incidents occurred." Meritor, 477 U.S. at 69.  "Evidence of a general work atmosphere therefore – as well as evidence of specific hostility directed toward the plaintiff – is an important factor in evaluating the claim." Penry, 155 F.3d at 1262 (quoting Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987)).  Thus, the fact that this incident was not directed towards plaintiffs or based on gender is significant, but not determinative, in the Court's analysis of the alleged hostile work environment.

With respect to the other incidents, the Court notes that only one incident was specifically directed at Clarke – Miller's referral of Clarke's husband as the "man that she happened to be sleeping with."  Clarke recalls Miller making this statement two times and found the comment offensive.  Neither Clarke nor Wolfard claims that Buckmaster or any other Bank employee made any sexual advances or otherwise made sexual comments that were specifically addressed to them.

The remaining three incidents were not directed toward either plaintiff.  It is certainly possible that Buckmaster would have displayed the photograph of women in bikinis on his computer, passed around pictures of scantily clad women, and referred to Rossman's breast augmentation even if only men were present.  However, as with the hypnotist incident, the Court takes these incidents into account in evaluating the work environment as a whole.  Even more so than the hypnotist event, the Court recognizes that these incidents have clear gender-related implications.  See Penry, 155 F.3d at 1263 (while male employee might have been as likely to take

a male assistant to Hooters or make gender-related comments to a male colleague, such incidents nonetheless had gender-related implications).  "Even where the motive behind the alleged conduct was not the plaintiff's gender, the court may still consider that conduct relevant when evaluating whether ambiguous conduct was in fact gender-motivated or whether gender-motivated conduct was so severe and pervasive as to create Title VII liability."  Id.

Viewing the record as whole, the Court finds that, as a matter of law, the incidents cited by plaintiffs were not "sufficiently severe or pervasive 'to alter the conditions of [plaintiffs'] employment and create an abusive working environment.'"  Meritor, 477 U.S. at 67 (citation omitted).  Only Clarke suffered from two sexual comments directed toward her.   The most severe incident – the tattoo incident – was not based on sex and occurred in a private environment.  The other comments and incidents, while vulgar and unprofessional, do not constitute a "steady stream of vulgar and offensive epithets because of [plaintiffs'] gender [that] would be sufficient to establish a claim under Title VII based on the theory of hostile work environment." Gross, 53 F.3d at 1439.  These incidents were "unpleasant and boorish," but not so severe or pervasive as to alter plaintiffs' conditions of employment.  Sprague, 129 F.3d at 1365.  Because the conduct alleged was not so extreme as to create an abusive working environment, the Court finds that defendant is entitled to summary judgment on plaintiffs' hostile work environment/sexual harassment claim.[4]

---

[4]      Because the Court finds that, as a matter of law, there was no hostile work environment, the Court need not reach the issue of whether defendant is entitled to the Faragher/Ellerth affirmative defense or whether Clarke was constructively discharged as a result of the alleged hostile work environment.

**B.**

In addition to their hostile work environment claim, plaintiffs allege that they were treated differently than their male counterparts on the basis of their sex, in violation of Title VII.  To survive summary judgment on their disparate treatment claim under Title VII, plaintiffs must satisfy the McDonnell Douglas burden shifting analysis.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  First, plaintiffs must establish a prima facie case of employment discrimination.  Id. at 802.  Plaintiffs must show that (1) they were members of a protected class, (2)  they were qualified for their job positions, and (3) an adverse employment decision was made by the employer. See Cole v. Ruidoso Mun. Schools, 43 F.3d 1373, 1380 (10th Cir. 1994).  If plaintiffs establish a prima facie case, defendant must articulate a legitimate, nondiscriminatory reason for the employment decision.  Id. at 803.  The ultimate burden of proving discrimination remains at all times on plaintiffs.  Burdine, 450 U.S. at 253.  If defendant carries its burden of production, the presumption of discrimination drops out of the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  Finally, the burden shifts back to plaintiffs to show that the Bank's stated nondiscriminatory reason is mere pretext for unlawful discrimination.  Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).

Here, plaintiffs are both members of a protected class, and there is no dispute that they were qualified for their positions at the Bank.  Plaintiffs contend that Wolfard suffered from an adverse employment action when she was not given a raise in 2005 and when she was terminated.  They contend that Clarke suffered an adverse employment action when she was denied a raise in 2005. Dkt. # 20, at 22-23.  Defendant appears to concede that plaintiffs have established a prima facie case

19

of discrimination because it focuses solely on the legitimate, nondiscriminatory reason for these actions in its brief.[5]  See Dkt. # 17, at 20-21.

Defendant contends that plaintiffs were denied raises in 2005 and Wolfard was terminated in 2005 based on their low loan production in 2004 and not on the basis of their sex.  Neither Clarke nor Wolfard disputes that they did not meet their production goals in 2004.  Failure to meet production goals is a legitimate, nondiscriminatory reason for denying plaintiffs raises and terminating Wolfard.  Thus, defendant has met its burden of production.

Plaintiffs contend that defendant's articulated nondiscriminatory reason for denying raises and terminating Wolfard was mere pretext for unlawful sex discrimination.  To show pretext, plaintiffs must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory.  Plaintiffs can produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).  Also, showing that the employer's

---

[5]      In the summary judgment record, there is evidence that Clarke and Wolfard were told that their attendance was no longer requested at the board meetings.  To the extent that plaintiffs claim that the decision to exclude them from board meetings constitutes sex discrimination in violation of Title VII, the Court finds that such a decision does not constitute an adverse employment action necessary to establish a prima facie case of discrimination.  An adverse employment action is an action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  Neither Clarke nor Wolfard's job responsibilities or benefits substantially changed as a result of their exclusion from the board meetings.  Thus, the Court focuses on plaintiffs' disparate treatment claim with respect to Bank's decision to deny them raises in early 2005 and to terminate Wolfard.

stated reason was not used to reject persons outside the protected group is one way to show that the employer's reason was pretext for discrimination.  Cole, 43 F.3d at 1381 n.6.  "Even though all doubts concerning pretext must be resolved in plaintiff[s'] favor, [plaintiffs'] allegations alone will not defeat summary judgment."  Morgan, 108 F.3d at 1324.  "Mere conjecture that the employer's explanations is pretext is insufficient basis to defeat summary judgment."  Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

To support their pretext argument, plaintiffs first argue that  "[t]he evidence indicates that not all Bank of Commerce employees charged with procuring loans even had production goals as it related to loan procurement."  Dkt. # 20, at 24.  The Court fails to see how this is evidence that defendant's proffered reason is pretextual.  The Bank is certainly not required to establish production goals for all Bank employees who procure loans.  Out of the ten people who were eligible for raises in 2005,[6] only Clarke, Wolfard, Buckmaster, and Jim Depriest had production goals.  Dkt. # 17-5, at 8.  Whereas Clarke and Wolfard did not meet their production goals and did not receive raises, Buckmaster and Depriest met their production goals and received raises.  The fact that the other six persons who received raises, all of whom were women, did not have production goals does not raise an inference of pretext.  Further, the fact that other senior vice presidents did not have specific production goals, while Clarke, Wolfard, Buckmaster, and Depriest had such goals, does not raise an inference of pretext.  See Dkt. # 20, at 12.  Again, the Bank is not required to establish specific production goals for all vice presidents.  Perhaps plaintiffs could show pretext if the Bank  established production goals for female employees only and not for male employees.

_____

[6]      These people included Clarke, Wolfard, Linda Hughes, Buckmaster, Jim Depriest, Rossman, Melissa Blair, Marcela Flery, Kendra Gardner and Margarita Wagoner.  Dkt. # 17-5, at 6.

However, the evidence clearly indicates – and plaintiffs do not dispute – that some male and some female employees had specific production goals.[7]

Plaintiffs also argue that Clarke's production goals "were not even formulated until December 2004."  Dkt. # 20, at 24.  Again, this fact does not suggest pretext for unlawful discrimination.  At most, it suggests that the Bank did not give her adequate notice that she was not meeting her production goals; it does not raise an inference that Clarke was discriminated on the basis of her gender.

Further, plaintiffs point out that "Ms. Wolfard was terminated supposedly for performance reasons while a male loan originator working under her supervision was engaging in substandard work and receiving no disciplinary action whatsoever." Dkt. # 20, at 18-19. The Court does not find this fact, even if true, constitutes evidence of pretext.  Miller testified that Wolfard was terminated because "she was the second highest paid person in the bank and her department was costing a large amount of money just personnel wise and she wasn't making any money for the bank." Dkt. # 17-5, at 17.  The male loan originator who was working under Wolfard's supervision was not earning the same salary as Wolfard.  Further, there is no evidence that he had specific production goals which he failed to meet.  Thus, the fact that a male employee who worked under Wolfard's supervision was

---

[7]     In her affidavit, Clarke states: "Of the male Senior Vice President's [sic] who received raises, I know that Troy Anderson was not meeting his expectations as to loan originations. Mr. Anderson discussed this at numerous loan committee meetings yet he received a raise in 2005." Dkt. # 21, Ex. H, ¶ 13.  The Court presumes that plaintiffs present this "evidence" to support their pretext argument that other senior vice presidents did not have goals and still received raises.  See Dkt. # 20, at 12. For the reasons set forth above, the Court finds this argument conclusory and not illustrative of pretext.  Further, there is no other evidence in the summary judgment record regarding Troy Anderson and whether he received a raise in 2005.  Clarke's conclusory statements in her affidavit regarding Troy Anderson's raise are insufficient to create a genuine issue of material fact.

not terminated, even if his production was low, does not create a genuine issue of material fact that Wolfard's was terminated on account of her sex.

Plaintiffs also points to Blacklock's testimony that, after Wolfard was terminated, Buckmaster said that another employee, Penny Chambers, would be the "next bitch to go." See Dkt. # 21, Ex. B, at 5.[8]  At first glance, this statement appears to raise an inference of sex discrimination given the usage of the word "bitch."  However, taken in context, the Court finds that the statement does not illustrate "discriminatory motive," as alleged by plaintiffs. See Dkt. # 20, at 24.  In context, the relevant testimony from Blacklock's deposition is as follows:

> Q:    Do you remember having conversation with [Buckmaster] [after Wolfard was terminated]?
> A:    Yes.
> . . . .
> Q:    . . . . Did you say in that conversation Mr. Buckmaster said something like I'm tired of them or these people?
> A:    I remember the thing that stuck out is he said, because it was somebody that I've known, he said "the next bitch to go" and he named Penny.  And he said "I'm tired of" and I know that he made reference to – I guess Penny has a lot of medical problems and he said – I know he said "I'm tired of her being a drain on the bank" and so on and so forth.  And I think when he said "them," referring to for whatever reason they got rid of Debbie [Wolfard], and then I know with Penny it wasn't her performance, he just said that her health is a major issue and it has been.
> Q:    Do you recall in this conversation Mr. Buckmaster saying anything else about Ms. Wolfard?

---

[8]    As a preliminary matter, the Court finds that this evidence is not hearsay under Fed. R. Evid. 801(d)(2). Fed. R. Evid. 801(d)(2)(D) includes as "not hearsay" "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  The fact that this statement was not necessarily against the Bank's interest when made is not controlling. "[A] statement qualifies as an admission even if it exonerates the speaker or states claims or justifications (but are offered against him on the theory that they actually undercut his position at trial)." 4 MUELLER & KIRKPATRICK, FEDERAL EVIDENCE § 411 (2d ed.).  As non-hearsay, the Court can consider this evidence in ruling on the motion for summary judgment.

A:      Just that he said she wasn't doing things right and that they caught her –
        something to do with money, paperwork, whatever.  And I just was like,
        well, do I need to watch her?  He said there's nothing she can really take,
        we've already got that stuff, so he insinuated that whatever her exact job was,
        that they caught her doing something shady.

Dkt. # 21, Ex. B, at 4-5. Even if Buckmaster used the word "bitch," Blacklock's testimony makes

clear that Buckmaster was concerned about Penny Chambers and Wolfard causing financial strain

on the Bank.  This isolated testimony, when taken in context, does not "persuade the district court

that [Bank of Commerce's] reason was unworthy of belief and a pretext to cover up discriminatory

motives." Pains v. Mission Hills Bank, 60 F.3d 1486, 1491 (10th Cir. 1995).

## IV.

In summary, the Court finds that defendant is entitled to summary judgment on all of

plaintiffs' claims.  With respect to plaintiffs' hostile work environment claim, the Court finds that,

as a matter of law, the incidents cited by plaintiffs did not alter the terms and conditions of plaintiffs'

employment.  With respect to plaintiffs' disparate treatment claim, defendant produced a legitimate,

non-discriminatory reason for denying plaintiffs raises in 2005 and for terminating Wolfard.

Plaintiffs did not present evidence to raise a genuine issue of material fact that defendant's proffered

reason was pretextual.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Dkt. # 16) is hereby **granted**.  Defendant Bank of Commerce's Motion in Limine (Dkt. # 23), the Motion of Defendants [sic] to Strike Plaintiffs' Untimely Pretrial Disclosure, Plaintiffs' Errata Correction to Response to Defendants' Motion for Summary Judgment and to Strike Statements from Plaintiffs' Response (Dkt. # 27), and Defendant's Unopposed Application to Withdraw Defendant's Motion to Strike Pretrial Disclosures (Dkt. # 28) are **moot**.  All deadlines and hearings are hereby **stricken**. A separate judgement is entered herewith.

Dated this 30th day of March, 2007.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT